UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
RYSZARD HEJMEJ, BOZENA HEJMEJ, and
TIBOR FARKAS,

                       Plaintiffs,

   -against-

PECONIC BAY MEDICAL CENTER and
NORTHWELLL HEALTH,

                      Defendants.
----------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**
17-cv-782 (JMA)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court in this civil rights action, on referral from the Honorable Joan M. Azrack for Report and Recommendation, are:  (i) Defendants' Peconic Bay Medical Center (the "Hospital") and Northwell Health ("Northwell" and together with the Hospital, "Defendants") motion for summary judgment ("Defendants' Motion" or "Def. Mot."), Docket Entry ("DE") [78]; and (ii) Plaintiffs' Ryszard Hejmej ("Ryszard"), Bozena Hejmej ("Bozena," together with Ryszard, the "Hejmejs"), and Tibor Farkas ("Farkas," together with the Hejmejs, "Plaintiffs") cross-motion for summary judgment ("Plaintiffs' Motion" or "Pl. Mot."). *See* DE [83].  Both motions are brought pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  *See* Def. Mot.; Pl. Mot.

By way of Complaint dated February 10, 2017, amended on September 21, 2019, Plaintiffs commenced this action against Defendants for violations of their rights under:  (1) Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*; (2) Section 504 of the Rehabilitation Act ("Rehabilitation Act"), 29

U.S.C. § 794 *et seq*.; (3) Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116 *et seq*.; and (4) various sections of the New York Human Rights Law. *See* Complaint ("Compl."), DE [1]; Amended Complaint ("AC"), DE [41]. Of particular relevance as explained below, Plaintiffs' remaining claims are for injunctive relief and emotional distress damages. *See id.* For the reasons set forth herein, the Court respectfully recommends that: (i) Defendants' Motion be granted in its entirety; (ii) Plaintiffs' Motion be denied in its entirety; (iii) Plaintiffs' ADA, Rehabilitation Act, and ACA claims be dismissed with prejudice; and (iv) Plaintiffs' state law claim be dismissed without prejudice to refiling in the proper forum.

## I.    BACKGROUND

### A. <u>The Parties</u>

The following facts are taken from the parties' pleadings, declarations, exhibits and respective Local Rule 56.1 statements. Except where indicated, these facts are not in dispute.

Plaintiffs are deaf and primarily communicate using sign language, though all are capable of communicating through lip-reading, written notes, text messages, and gesturing. *See* Defendants' Rule 56.1 Statement of Material Facts Not in Dispute ("Def. 56.1"), DE [78-50], ¶¶ 12-19, 37-44, 119-27; Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts ("Pl. 56.1"), DE [83-46], ¶¶ 1-17. Plaintiffs can each understand and read English. *See id.* The Hejmejs are married and Farkas is a friend of the Hejmejs. *Id.* Defendant Northwell operates the Hospital, where Plaintiffs were treated at different points between 2014 and 2018. *See generally* Def. 56.1; Pl. 56.1.

2

B. **The Hospital's Policies and Practices Regarding Deaf Patients**

The Hospital's policies require that: (1) Hospital staff offer deaf patients and their companions auxiliary aids and interpreting services at each step of their care; (2) such offers – and any refusals – must be documented on a specific form and placed in that patient's medical records; and (3) all Hospital employees are permitted to offer and provide these interpreting services. *See* Pl. 56.1 ¶¶ 18-35.

Pursuant to Hospital policy that was in effect between 2014 and 2016, deaf patients were to be provided with qualified sign language interpreting services through a video remote interpreting ("VRI") device provided by a company known as TransPerfect. *See* Def. 56.1 ¶ 2. When this policy was first implemented, the Hospital's VRI devices were available at all times. *Id*. at ¶ 3. The Hospital gradually increased its number of available VRI devices which Hospital physicians and clinical employees used to access sign language interpreters when needed to communicate with deaf patients. *Id*. In situations where VRI is not available, the Hospital also has the ability to provide in-person sign language interpreting services. *Id*. at ¶ 5.

After Northwell took over the Hospital's operations in 2017, it implemented the current iteration of its "People Who Are Deaf or Hard of Hearing" Policy (the "Policy") in or about July 2017. *See id*. at ¶ 6. Pursuant to the Policy, each deaf or hard of hearing patient is informed of his or her right to free interpreting services, and each Hospital staff member is required to document offers of interpreting services, and each offer's acceptance or refusal. *Id*. at ¶ 7. In early 2018, the Hospital upgraded its VRI offerings to use an iPad application through its vendor – a company

known as "Language Line" – for interpreting all languages, including American Sign Language ("ASL").  *Id.* at ¶ 8.  During all relevant times, the Hospital trained its clinical staff regarding the provision of sign language interpreting services to deaf patients, including annual education with regard to the VRI systems.  *Id.* at ¶ 11.

### C. <u>Plaintiffs' Interactions with the Hospital</u>

As noted above, Plaintiffs sought medical treatment from the Hospital multiple times between 2014 and 2018.  *See generally* Def. 56.1; Pl. 56.1.  Each Plaintiff's visit(s) to the Hospital is summarized below.

#### 1. <u>Bozena's Medical Treatment at the Hospital</u>

Bozena went to the Hospital's Emergency Department ("ED") with Ryszard on February 14, 2014, in order to obtain a medically-advised CT scan after falling and hitting her head.  *See* Def. 56.1 ¶¶ 20-21.  Upon arriving at the ED, the Hejmejs identified themselves as deaf to the Hospital's registrar.  *Id.* at ¶ 22.  Bozena was then interviewed and assessed by triage nurse, Kim Nazario, who indicated in her triage note that "Pt. needs hearing impaired interpreter."  *Id.* at ¶ 23.  The Hejmejs next encountered the ED's floor nurse, Dennis Cacciatore, with whom Bozena communicated entirely via writing.  *Id.* at ¶ 25.

Bozena was next examined by Physician's Assistant Lyndsie Watkins ('PA Watkins"), who obtained a detailed medical history from her.  *Id.* at ¶ 26.  The ED's attending physician, Dr. Robert Ehlers, met with the Hejmejs and – without offering ASL interpretation – apprehended that she had "vomited earlier in the day, the pain medication she was taking, and her history of back pain."  *Id.* at ¶¶ 28-30.  Bozena

4

then underwent a CT scan. *Id.* After the scan, she was treated and discharged. *Id.* at ¶¶ 32-33. Bozena has not returned to the Hospital as a patient since this visit. *Id.* at ¶¶ 34-35.

### 2. Ryszard's Medical Treatment at the Hospital

Ryszard was a patient at the Hospital on: April 6-7, 2016; June 15, 2016; June 16-17, 2016; July 2-3, 2016; July 10-11, 2016; and July 30-31, 2016. *See* Pl. 56.1 ¶ 42. Bozena accompanied him for all of these visits, while Farkas accompanied the Hejmejs during Ryszard's April 2016 visit and for his first July 2016 visit. *Id.* at ¶¶ 43-44. Their experiences were as follows:

- **April 6-7, 2016:** On April 6, 2016, Ryszard came to the Hospital's ED complaining of high blood pressure and chest tightness, accompanied by Bozena and Farkas. Def. 56.1 ¶¶ 45-46; Pl. 56.1 ¶ 46. Plaintiffs contend that, upon arrival, Ryszard "informed the front desk that he is deaf and requested an interpreter, and later repeated this request to a nurse and three other Hospital employees." Pl. 56.1 ¶ 47. The parties disagree whether Ryszard requested interpretation services but agree that they were not provided to him. *See* Def. 56.1 ¶¶ 55-56; Pl. 56.1 ¶ 50. PA Watkins obtained Ryszard's medical history, including specific information regarding his medication, symptoms, and concerns, while attending ED physician Dr. Jeffrey Cangelosi obtained from Ryszard "a description of a 20+ minute episode of chest pain radiating down both arms." Pl. 56.1 ¶¶ 51, 53. Ryszard stayed at the Hospital's telemetry unit overnight for observation before being discharged the next day. *Id.* at ¶¶ 57-58.

- **June 15, 2016:** Accompanied by Bozena and Farkas, Ryszard arrived at the ED complaining of high blood pressure. Def. 56.1 ¶¶ 59-60. Both the ED's triage nurse and the floor nurse communicated with him via lip-reading. *Id.* at ¶¶ 61-62. Dr. Cangelosi obtained information from Ryszard regarding his symptoms, complaints, and previous medical visits without the use of any interpretation services. *Id.* at ¶¶ 63-66. Ryszard was treated and discharged after nearly three-hours. *Id.* at ¶¶ 67-68.

- **June 16-17, 2016:** Accompanied by Bozena, Ryszard arrived at the ED on June 16, 2016 for elevated blood pressure. *Id.* at ¶¶ 69-70. Ryszard again informed the front desk that he was deaf and requested an interpreter. Pl.

56.1 ¶¶ 65, 66. Both the floor nurse and Dr. Cangelosi – who had seen Ryszard before – communicated with him without the use of any interpreting services. *See* Def. 56.1 ¶¶ 72-74. Ryszard was treated and discharged after approximately three hours. *Id.* at ¶¶ 75, 78.

- **July 2-3, 2016:** Accompanied by Bozena and Farkas, Ryszard arrived at the ED on July 2, 2016 for anxiety caused by high blood pressure. *Id.* at ¶¶ 79-80. According to Plaintiffs, Ryszard requested interpreting services, and his intake notes from that night indicate his deafness. *See* Pl. 56.1 ¶¶ 75-76. PA Watkins – without an interpreter, according to Plaintiffs – obtained detailed medical information from Ryszard "including that he was anxious and agitated even after taking clonazepam, and that his blood pressure was 200/100 when measured at home." Def. 56.1 ¶¶ 82-83. Ryszard was treated and discharged after approximately three hours. *Id.* at ¶¶ 87-88.

- **July 10-11, 2016:** Accompanied by Bozena, Ryszard sought medical treatment from the ED for anxiety caused by chest pain and elevated blood pressure. *Id.* at ¶¶ 89-90. Ryszard was admitted to the Hospital's telemetry unit to obtain a cardiology consultation and for observation overnight. *Id.* at ¶ 94. Ryszard requested that the floor nurse, Niquela Durham ("Durham") use VRI to communicate with him, but the VRI device malfunctioned. *Id.* at ¶ 95. Defendants contend that Durham told Ryszard that "she could order a live interpreter, which would take approximately an hour" but that Ryszard stated that "that he would use pen and paper to communicate with Hospital staff overnight," Def. 56.1 ¶¶ 96-100, while Plaintiffs assert that Ryszard preferred to wait for the live interpreter. *See* Pl. 56.1 ¶¶ 88-89. Ryszard was treated and discharged the next day. *See* Def. 56.1 ¶¶ 105-06.

- **July 30-31, 2016:** The Hejmejs came to the ED on July 30, 2016, again for Ryszard's elevated blood pressure, having run out of medication two days earlier. *Id.* at ¶¶ 107-08. According to Plaintiffs, Ryszard requested an interpreter from the front desk nurse but never received one. Pl. 56.1 ¶ 99. Notwithstanding Defendants' contention that Hospital staff was capable of communicating with Ryszard during his visit, *see* Def. 56.1 ¶¶ 109-13, 115, the parties do not dispute that Ryszard was never provided with a sign language interpreter during his visit. *See* Pl. 56.1 ¶ 101. Ryszard was treated and discharged less than two hours later. *See* Def. 56.1 ¶¶ 116-17.

6

3.  <u>Farkas's Medical Treatment at the Hospital</u>

Farkas was a patient at the Hospital on:  November 27, 2014; May 1, 2016; May 2, 2016; and April 28-May 3, 2018.  *See* Pl. 56.1 ¶ 117.  Ryszard accompanied Farkas on some of these visits.  *Id.* at ¶ 118.  Their experiences were as follows:

- **November 27, 2014:** Farkas visited the ED by himself for an undisclosed reason.  Pl. 56.1 ¶ 121.  The parties agree that, while Hospital staff treated Farkas, he did not receive a sign language interpreter.  *Id.* at ¶ 122.

- **May 1, 2016:** Farkas visited the ED by himself complaining of back pain.  *Id.* at ¶¶ 129-30.  He requested sign language interpreting services, but the Hospital's VRI malfunctioned, and he communicated with Hospital staff via written notes.  *Id.* at ¶ 132.  While the ED's floor nurse and attending physician communicated with and treated Farkas, *see* Def. 56.1 ¶¶ 133-37, he was not provided with a sign language interpreter.  *See* Pl. 56.1 ¶¶ 124, 126.  Farkas was treated and released later that day.  Def. 56.1 ¶¶ 138-39.

- **May 2, 2016:** Farkas visited the ED by himself the next day complaining of back pain.  *Id.* at ¶ 140.  Farkas apparently requested, but did not receive, a sign language interpreter.  He instead communicated with Hospital staff via written notes.  *See* Pl. 56.1 ¶¶ 134-35; Def. 56.1 ¶¶ 142-47.  Farkas was treated and released later that day.  Def. 56.1 ¶¶ 148, 150.

- **April 28-May 3, 2018:** Farkas was brought to the ED on April 28, 2018, after collapsing and being found unresponsive in a local library.  *Id.* at ¶ 151.  While Farkas – who was briefly accompanied by Ryszard – could not initially communicate with an interpreter, he apparently spoke with one shortly after admission.  *Id.* at ¶¶ 152-54, 174.  Farkas met with multiple Hospital staff members regarding his medical issues and communicated with all of them via the Hospital's VRI system.  *Id.* at ¶¶ 158-60.  Defendants contend that, for an unknown reason, Farkas refused to continue using the Hospital's VRI technology.  *Id.* at ¶¶ 161-65.  On May 3, 2018, Farkas had a psychiatric consultation and met with the ED's attending physician, communicating through an interpreter.  *Id.* at ¶¶ 169-70.  After these consultations, Farkas was treated and discharged on May 3, 2018.  *Id.* at ¶¶ 173, 175.

- **May 3, 2018:** On May 3, 2018, less than four hours after his discharge, Farkas returned to the ED, allegedly seeking a prescription for Suboxone.  *Id.* at ¶ 176.  At this time, the ED used a "split flow" process, where one physician served a triage function and examined the patient briefly to

7

determine whether he or she could be designated to the "fast track" area, used for minor complaints. *Id.* at ¶ 177. The split flow physician determined that Farkas could be sent to the ED's fast track area, where he was then examined and interviewed by a PA via VRI. *Id.* at ¶¶ 178-82. Farkas was thereafter treated and discharged. *Id.* at ¶¶ 183-84.

### D. Procedural History

Based on the above, the Hejmejs commenced this action against Defendants by way of Complaint dated February 10, 2017, asserting claims for violation of their rights under: (1) Title III of the ADA; (2) Section 504 of the Rehabilitation Act; (3) Section 1557 of the ACA; and (4) various sections of the New York Human Rights Law. *See* Compl. Defendants filed their Answer to the Complaint on May 15, 2017, *see* DE [12], and the parties appeared before Judge Azrack for an Initial Conference on June 14, 2017. *See* DE [16]. Discovery commenced thereafter. On September 21, 2019, with Judge Azrack's permission, Plaintiffs amended their Complaint to: (i) correct scrivener's errors; (ii) clarify certain allegations; and (iii) name Farkas as an additional Plaintiff. *See* AC. Defendants filed their Answer to the Amended Complaint on October 14, 2019. *See* DE [43]. Discovery continued until its July 2021 completion. *See* DE [63]. At this point in the litigation, Plaintiffs' only remaining claims are for injunctive relief and emotional distress damages. *See* Compl; AC.

On February 4, 2022, the parties filed their respective motions for summary judgment, *see* Def. Mot.; Pl. Mot., which Judge Azrack referred to this Court for Report and Recommendation on April 29, 2022. *See* April 29, 2022 Electronic Order. On May 19 and May 27, 2022, respectively, the parties submitted supplemental letters addressing the Supreme Court's April 28, 2022 decision in *Cummings v.*

*Premier Rehab Keller, P.L.L.C.*, 596 U.S. _, 142 S. Ct. 1562 (2022), and its impact on the instant motions.  *See* DEs [86], [87], [89].  For the reasons set forth below, the Court respectfully recommends that:  (i) Defendants' Motion be granted in its entirety; (ii) Plaintiffs' Motion be denied in its entirety; (iii) Plaintiffs' ADA, Rehabilitation Act, and ACA claims be dismissed with prejudice; and (iv) Plaintiffs' state law claim be dismissed without prejudice to refiling in the proper forum.

## II.    LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of establishing that there are no issues of material fact such that summary judgment is appropriate.  *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004.  In deciding the motion, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986) (holding that a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the movant has met its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as

to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986) (internal quotation omitted); *see also Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 542 (E.D.N.Y. 2014) ("An issue of fact is considered 'genuine' when a reasonable finder of fact could render a verdict in favor of the non-moving party").

In determining whether summary judgment is warranted, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986); *see also Artis v. Valls*, No. 9:10-cv-427, 2012 WL 4380921, at *6, n. 10 (N.D.N.Y. Sept. 25, 2012) ("It is well established that issues of credibility are almost never to be resolved by a court on a motion for summary judgment").

## III.   DISCUSSION

Plaintiffs allege causes of action under:  (1) Title III of the ADA; (2) Section 504 of the Rehabilitation Act; (3) Section 1557 of the ACA; and (4) various sections of the New York Human Rights Law.  Applying the standards above, and for the reasons below, the Court respectfully recommends that:  (i) Defendants' Motion be granted in its entirety; (ii) Plaintiffs' Motion be denied in its entirety; (iii) Plaintiffs' ADA, Rehabilitation Act, and ACA claims be dismissed with prejudice; and (iv) Plaintiffs' state law claim be dismissed without prejudice to refiling in the proper forum.

## A. **Applicability of** *Cummings v. Premier Rehab Keller, P.L.L.C.*

The Court first evaluates whether the Supreme Court's recent decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. __, 142 S. Ct. 1562 (2022), forecloses Plaintiffs' claims for emotional distress damages in this matter.[1] Defendants contend that *Cummings* is binding on the parties' instant dispute, and precludes Plaintiffs' suit as a matter of law because the only damages they seek are for alleged emotional distress – a category expressly precluded by *Cummings*.  *See* DEs [86], [89].   Plaintiffs, on the other hand, assert that – notwithstanding *Cummings* – they "may still seek compensatory damages under federal law" and maintain "federal-question jurisdiction in this courthouse."  DE [87].

In its recent 6-3 decision, the Supreme Court held that a plaintiff suing under the implied rights of action in the Rehabilitation Act and ACA cannot recover compensatory damages for emotional distress.  *See Cummings*, 142 S. Ct. at 1576. The Supreme Court's analysis centered on the fact that both the Rehabilitation Act and ACA were passed pursuant to Congress's powers under the Constitution's Spending Clause and that the "legitimacy of Congress' power" to enact Spending Clause legislation depends upon "whether the recipient [of federal funds] voluntarily and knowingly accepts the terms of that contract."  *Id.* at 1570 (internal citation omitted).  Indeed, the Supreme Court held that lower courts "may presume that a funding recipient is aware that, for breaching its Spending Clause 'contract' with the

---

[1] The Court acknowledges that the parties' motions for summary judgment were fully briefed and filed prior to the Supreme Court's April 28, 2022 opinion in *Cummings*.

Federal Government, it will be subject to the *usual* contract remedies in private suits." *Id.* at 1571 (emphasis in original).

The Court then concluded that because emotional distress damages are not typically available in contract cases, *see id.* at 1571-76, a recipient of federal funds would not have had sufficient notice of its potential liability for such damages when it "'engaged in the process of deciding whether [to] accept' federal dollars...." *Id.* at 1570-71 (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296, 126 S. Ct. 2455, 2459 (2006)). For this reason, the Supreme Court concluded, the plaintiff could not recover damages for the "humiliation, frustration, and emotional distress" she suffered as a result of the defendant's alleged discrimination. *Id.* at 1569 (internal citation omitted).

A review of the *Cummings* decision and Plaintiffs' claims in the case at hand leads the Court to conclude that *Cummings* is both directly applicable to, and binding on this matter. In doing so, the Court rejects Plaintiffs' arguments that *Cummings* should not be followed because it: (1) was wrongly decided; and (2) does not apply retroactively. *See* DE [87]. Not only will this Court not relitigate a matter so recently decided by the Supreme Court, but it is well-established that where the Supreme Court "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Supreme Court's] announcement of the rule." *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97, 113 S. Ct. 2510, 2517 (1993). The Court thus

concludes that the Supreme Court's opinion in *Cummings* is binding on this Court and the case at bar.

### B. Plaintiffs' ADA and Rehabilitation Act Claims

Both parties seek summary judgment on Plaintiffs' ADA and Rehabilitation Act claims. *See generally* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def. Mem."), DE [78-51]; Plaintiffs' Brief in Support of Motion for Summary Judgment ("Pl. Mem."), DE [83-47]. Both the ADA and Rehabilitation Act "prohibit discrimination against qualified disabled individuals by requiring that they receive reasonable accommodations that permit them to have access to and take a meaningful part in public services and public accommodations," and claims brought under both acts are typically analyzed in tandem. *See Schoengood v. Hofgur LLC*, No. 20-cv-2022, 2021 WL 1906501, at *3 (E.D.N.Y. May 12, 2021) (quoting *Powell v. National Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004)). In order to do so, courts within the Second Circuit employ a three-part test, through which a plaintiff must demonstrate that: (1) he or she is a "qualified individual" with a disability; (2) the defendants are subject to the ADA and Rehabilitation Act; and (3) the plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against, by reason of a plaintiff's disabilities. *Id.* at 85.

In order to satisfy the third prong and establish discrimination, a plaintiff may rely on one of three theories of liability: (1) "disparate treatment"; (2) "disparate impact"; or (3) "failure to make a reasonable accommodation." *Fulton v. Goord*, 591

F.3d 37, 43 (2d Cir. 2009).  In this context, defendants have a presumptive obligation to provide "reasonable accommodations" to individuals with disabilities, and a covered entity's failure to provide such accommodations will be sufficient to satisfy the abovementioned third prong.  *See* 42 U.S.C. § 12182(b)(2)(a)(ii); *Powell*, 364 F.3d at 85.  The question of whether a proposed accommodation is reasonable is fact-specific and must be evaluated on a case-by-case basis.  *See Schoengood*, 2021 WL 1906501, at *3 (citing *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122 (2d Cir. 1999)).

Further, while Title III of the ADA allows for injunctive relief, but not damages, *see Powell*, 364 F.3d at 86, the Rehabilitation Act allows for the recovery of damages, provided that the plaintiff shows that the statutory violation resulted from "deliberate indifference" to the rights secured by that statute.  *See Schoengood*, 2021 WL 1906501, at *3 (citing *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 115 (2d Cir. 2001)).  A plaintiff must also demonstrate that defendants received federal funding in order to establish a violation under the Rehabilitation Act. *Id.* (citing *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)); *see also Doe v. Trustees of Columbia Univ. in City of New York*, No. 21-cv-1697, 2021 WL 1253974, at *4 (S.D.N.Y. Apr. 1, 2021).

Applying these standards and the *Cummings* opinion to the facts at hand, the Court concludes that Defendants' Motion should be granted as to Plaintiffs' ADA and Rehabilitation Act causes of action, and these claims should be dismissed with prejudice.  Initially, the parties do not dispute that Plaintiffs are "qualified individuals" with disabilities under the Rehabilitation Act and ADA, *see* AC ¶¶ 57,

71, and Defendants both "own[ed], lease[d], and/or operate[d] a place of public accommodation within the meaning of the ADA" and "have each been programs or activities receiving federal financial assistance pursuant to [the Rehabilitation Act]." *Id.* at ¶¶ 58, 72. Thus, the issue in dispute is whether Plaintiffs have sufficiently established that Defendants discriminated against them because of their disabilities during any one or more of their visits to the Hospital. The Court need not reach this issue, however, because Plaintiffs are precluded – by the ADA's text and the Supreme Court's ruling in *Cummings* – from seeking compensatory damages for alleged emotional distress. *See Milhouse v. Hilton Garden Inn Employees*, No. 22-cv-2934, 2022 WL 1749844, at *7 (S.D.N.Y. May 31, 2022) (citing *Powell*, 364 F.3d at 86); *Cummings*, 142 S. Ct. at 1576.

Beginning with Plaintiffs' ADA claim, the only relief which they could seek would be injunctive relief, as private individuals "cannot recover [compensatory] damages" under Title III of the ADA. *Milhouse*, 2022 WL 1749844, at *7 (quoting *Powell*, 364 F.3d at 86). Initially, the parties do not dispute that Ryszard withdrew his request for injunctive relief at the initial summary judgment briefing stage. *See generally* Pl. Mot. Moreover, a review of the evidence before the Court reveals that both Bozena and Farkas lack standing to pursue injunctive relief under the ADA, as neither has established that they intend to return to the Hospital for medical treatment, *see* Def. 56.1 ¶¶ 35, 118, 120 – a crucial element of an injunctive relief claim. *See Krist v. Beth Israel Med. Ctr.*, No. 17-cv-1312, 2021 WL 4442943, at *9 (S.D.N.Y. Sept. 28, 2021) (citing *Schroedel v. New York Univ. Med. Ctr.*, 885 F. Supp.

15

594, 599 (S.D.N.Y. 1995)) (finding a plaintiff's "mere speculation" that she may be subject to future harm by merely returning to the defendant hospital insufficient to confer Article III standing).  For these reasons, the Court respectfully recommends that Defendants' Motion be granted as to Plaintiffs' ADA cause of action, and that this claim be dismissed with prejudice.

Turning next to Plaintiffs' Rehabilitation Act claim, the Court concludes that Defendants' Motion should be granted as to this cause of action, and that it too should be dismissed with prejudice.  As a threshold matter, the *Cummings* decision squarely applies to Plaintiffs' Rehabilitation Act cause of action.  Plaintiffs undisputedly seek compensatory damages only for alleged emotional distress, *see* Pl. 56.1 ¶¶ 166-71 – the very type of damages precluded by the Supreme Court in the context of Rehabilitation Act claims.  *See Cummings*, 142 S. Ct. at 1576.  For this reason, the Court respectfully recommends that Defendants' Motion be granted as to Plaintiffs' Rehabilitation Act cause of action, and that it be dismissed with prejudice.   In reaching this conclusion, the Court rejects Plaintiffs' arguments that, notwithstanding the above recommendations, they are nevertheless entitled to:  (i) expectation damages; (ii) nominal damages; and (iii) damages for "dignitary harm." *See* DE [87].

Plaintiffs base their first counterargument – that they are entitled to "expectation damages" on:  (1) the *Cummings* court's conclusion that Defendants are subject "to those remedies traditionally available in suits for breach of contract," *Cummings*, 142 S. Ct. at 1574; (2) the notion that patients who arrive at a hospital

16

for treatment "expect that they will be able to communicate with their healthcare providers" about their current medical conditions, DE [87] at 5; and (3) a recent post-*Cummings* decision – *Montgomery v. District of Columbia*, No. 18-cv-1928, 2022 WL 1618741, at *25 (D.D.C. May 23, 2022) – where a district court outside of the Eastern District of New York allegedly "confirmed the availability of such damages." DE [87] at 5. This argument fails in its entirety based on a misunderstanding of *Cummings*. The Supreme Court has precluded an award of emotional distress damages based on the expectations of Defendants' contractual relationship with the federal government when accepting federal funds. *See Cummings*, 142 S. Ct. at 1571. According to the Court, that contractual relationship does not give rise to an expectation of emotional distress damages claimed by Defendants' patients. *Id.* at 1576. As a result, none can be claimed. This is distinguished from the putative contractual relationship between the parties here. Plaintiffs are not seeking damages based on a breach of contract in this case, which might otherwise lead to expectation damages. Rather, they are seeking emotional distress damages based on a federal statute, namely the Rehabilitation Act, which *Cummings* precludes. *See Cummings*, 142 S. Ct. at 1576.

Moreover, Plaintiffs' reliance on *Montgomery* is misplaced. Not only is *Montgomery* not binding on this Court, but significant factual distinctions exist. In *Montgomery*, a mentally ill plaintiff was interrogated multiple times in connection with a murder investigation, where law enforcement not only failed to accommodate his disabilities, but took advantage of them to elicit incriminating statements, leading

to the plaintiff spending five-and-a-half years in prison awaiting trial. *See Montgomery*, 2022 WL 1618741, at *1-6. As a result of his civil lawsuit, the court awarded the plaintiff damages based on "the opportunity he lost when he was denied the ability to meaningfully access and participate in his interviews." *Id.* at *25. Not only are these facts drastically different from the facts at hand, but even if this Court were to adopt the *Montgomery* court's non-binding decision, Plaintiffs here have offered no evidence or authority upon which the Court could base a decision that they should be awarded any contract-based damages for their non-compensable injuries. For these reasons, this first counterargument fails.

The Court similarly rejects Plaintiffs' argument that they are entitled to nominal damages. Plaintiffs' alleged entitlement is three-pronged and based on: (i) the Rehabilitation Act's incorporation of Title VI's remedies (one of which is nominal damages); (ii) "longstanding contract-law principles"; and (iii) Supreme Court precedent (specifically *Uzuegbunam v. Preczewski*, 592 U.S. _, 141 S. Ct. 792, 809 (2021)). *See* DE [87] at 8. Defendants counter that, in the wake of *Cummings*, Plaintiffs "cannot salvage" their Rehabilitation Act claim "merely by recasting their request for relief as seeking nominal damages." DE [86] at 2. The Court agrees. Indeed, the injuries at the heart of Plaintiffs' claims amount to non-compensable emotional distress. This Court will not – and frankly, cannot – permit an award of damages, regardless of amount, where doing so would directly contradict a Supreme Court ruling. For this reason, the Court rejects Plaintiffs' second counterargument.

Finally, the Court rejects Plaintiffs' contention that they are entitled to damages for "dignitary harm" sustained as a result of Defendants' alleged discrimination.    Plaintiffs offer no post-*Cummings* authority to support their argument that compensatory damages for "dignitary harm" are distinct from the emotional distress damages precluded by *Cummings*.  *See Cummings*, 142 S. Ct. at 1576.  Moreover, Plaintiffs have failed to demonstrate that damages for "dignitary harm" fall within the ambit of the "usual contract remedy" damages deemed recoverable by the Supreme Court.  *See id.* at 1571.  The Court thus rejects Plaintiffs' third counterargument and, for the reasons set forth above, respectfully recommends that:  (i) Defendants' Motion be granted as to Plaintiffs' ADA and Rehabilitation Act causes of action; (ii) Plaintiffs' Motion be denied as to these claims; and (iii) Plaintiffs' ADA and Rehabilitation Act claims be dismissed with prejudice.

## C. **Plaintiffs' ACA Claim**

Both parties next seek summary judgment on Plaintiffs' ACA cause of action. *See generally* Def. Mem.; Pl. Mem.  Section 1557 of the ACA provides that no individual shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a).  ACA Section 1557 claims are typically analyzed identically to Rehabilitation Act Section 504 claims. *See Vega-Ruiz v. Montefiore Med. Ctr.*, No. 17-cv-1804, 2019 WL 3080906, at *3, n. 3 (S.D.N.Y. Jul. 15, 2019).  Nevertheless, the regulations implementing the ACA and the Rehabilitation Act differ. *See Fantasia v. Montefiore New Rochelle*, No. 19-cv-

11054, 2022 WL 294078, at *7 (S.D.N.Y. Feb. 1, 2022). Specifically, ACA regulations require an entity operating covered health programs or activities to "take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in such programs or activities, in accordance with" certain ADA regulations. 45 C.F.R. § 92.102(a); *accord Vega-Ruiz v. Northwell Health*, 992 F.3d 61, 65-66 (2d Cir. 2021) (*per curiam*).

Under those ADA regulations, a covered entity must "give primary consideration to the requests of individuals with disabilities" when "determining what types of auxiliary aids and services are necessary." 28 C.F.R. § 35.160(b)(2). To afford an individual "primary consideration" means the individual's choice of auxiliary aid must be honored unless the entity "can demonstrate that another equally effective means of communication is available or that the aid or service requested would fundamentally alter the nature of the program, service, or activity or would result in undue financial and administrative burdens." *Fantasia*, 2022 WL 294078, at *7 (quoting *Hernandez v. N.Y.S. Bd. of Elections*, 479 F. Supp. 3d 1, 12 (S.D.N.Y. 2020)). Healthcare providers may not "rely on an adult accompanying an individual to interpret or facilitate communication," with two presently inapplicable exceptions. *See Fantasia*, 2022 WL 294078, at *7 (quoting 28 C.F.R. § 35.160(c)(2)(ii)).

Applying these standards, the Court again concludes that Plaintiffs have failed to provide the Court with evidence to either defeat Defendants' Motion or support their motion for summary judgment. Initially, as explained in detail above, the Supreme Court's holding in *Cummings* explicitly precludes an individual suing under

the ACA's implied right of action from seeking emotional distress damages.  *See Cummings*, 142 S. Ct. at 1576.  Here, Plaintiffs' ACA cause of action seeks solely compensatory damages for emotional distress caused by Defendants' alleged discrimination, and thus fails as a matter of law.  For this reason, the Court respectfully recommends that:  (i) Defendants' Motion be granted as to Plaintiffs' ACA cause of action; (ii) Plaintiffs' Motion be denied as to this claim; and (iii) Plaintiffs' ACA claim be dismissed with prejudice for failure to state a claim.

### D. <u>Plaintiffs' State Law Claim</u>

Having determined that Plaintiffs' federal claims should be dismissed, the Court recommends declining to exercise supplemental jurisdiction over their claim brought pursuant to the New York Human Rights Law.  *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction." (internal quotation marks omitted)); *see also Quiroz v. U.S. Bank Nat'l Ass'n*, No. 10-cv-2485, 2011 WL 2471733, at *8 (E.D.N.Y. May 16, 2011) (recommending that the district court decline to exercise supplemental jurisdiction), *report and recommendation adopted*, 2011 WL 3471497 (E.D.N.Y. Aug. 5, 2011).

Indeed, in the interest of comity, the Second Circuit has instructed that, absent exceptional circumstances, where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should "abstain from exercising pendent jurisdiction."  *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-cv-6497, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007), *aff'd sub nom. Burch v. Pioneer Credit*

*Recovery, Inc.*, 551 F.3d 122 (2d Cir. 2008) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986), *cert. denied*, 476 U.S. 1159, 1159, 106 S. Ct. 2278, 2278 (1986)); *see also City of Chi. v. Int'l Coll. Of Surgeons*, 522 U.S. 156, 173, 118 S. Ct. 523, 534 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S. Ct. 614, 619 (1988)) ("[T]he statute reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, a 'federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness and comity.'"). Accordingly, the Court respectfully recommends that Plaintiffs' claim brought pursuant to the New York State Human Rights Law be dismissed without prejudice and with leave to refile in the appropriate forum.

## IV.   CONCLUSION

For the reasons set forth above, the Court respectfully recommends that: (i) Defendants' Motion be granted in its entirety; (ii) Plaintiffs' Motion be denied in its entirety; (iii) Plaintiffs' ADA, Rehabilitation Act, and ACA claims be dismissed with prejudice; and (iv) Plaintiffs' state law claim be dismissed without prejudice to refiling in the proper forum.

## V.   OBJECTIONS

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72; *Ferrer v. Woliver*, No. 05-cv-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008);

*Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84

F.3d 52, 60 (2d Cir. 1996).


Dated:    Central Islip, New York
          July 5, 2022

                                      /s/ Steven I. Locke
                                      STEVEN I. LOCKE
                                      United States Magistrate Judge

23